**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MILTON YOUNG,

                    Plaintiff,

      v.                                     1:24-cv-01174 (AMN/DJS)

THE SHAKER GROUP, INC.,

                    Defendant.

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **MESIDOR PLLC** | **MARJORIE MESIDOR, ESQ.** |
| 30 Station Road – Suite 5 | **ALEXANDRIA JEAN-PIERRE,** |
| Bellport, New York 11713 | **ESQ.** |
| *Attorneys for Plaintiff* | **KATLYN PATRICIA** |
| | **PALMATIER, ESQ.** |
| **BOND, SCHOENECK & KING, PLLC** | **HOWARD M. MILLER, ESQ.** |
| 68 South Service Road – Suite 400 | |
| Melville, New York 11747 | |
| *Attorneys for Defendant* | |

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

On September 24, 2024, plaintiff Milton Young ("Plaintiff") commenced this action against defendant The Shaker Group, Inc. ("Defendant"), alleging violations of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL") arising from his termination by Defendant in March 2022. Dkt. No. 1 ("Complaint"). Presently before the Court is Defendant's motion for summary judgment. Dkt. No. 50 ("Motion"); *see also* Dkt. Nos. 53, 56. For the reasons set forth below, the Motion is denied.

## II.    BACKGROUND[1]

### A. The Parties and Relevant Individuals

Defendant is a corporation organized under New York State law and located in Waterford, New York. Dkt. No. 1 at ¶ 3. Defendant has operated since 1988 and consists of two companies: Shaker Transport and Shaker Logistics. Dkt. No. 53-1 at ¶ 2. Shaker Transport is responsible for fleet operations, i.e., transporting customer freight and related duties on Shaker Transport-owned vehicles. *Id.* Shaker Logistics manages and arranges for transportation by subcontracting with transportation providers and includes brokerage staff, support staff, accounting, human resources, the company's owners, and consultants. *Id.* The support staff includes employees who work in sales; they are responsible for adding new business by finding new customers and growing current customer accounts, and they also act as brokers to arrange for transportation of customers' freight. *Id.* at ¶ 3.

Plaintiff is a Black man who was employed by Defendant in a sales role from June 2021 until his termination in March 2022. *Id.* at ¶¶ 4, 49.

During this time, Defendant also employed the following nonparties, among others: Jason Smith, as President and Chief Executive Officer ("CEO"), *id.* at ¶ 4; Zachary Pappas as Chief Operating Officer ("COO"), *id.* at ¶ 6; and Megan Fagnani, as People and Staffing Manager, *id.* at ¶ 9. Mr. Smith and Mr. Pappas are also owners of Defendant. *See, e.g.,* Dkt. No. 53-28 at 23:8-16.[2] Mr. Smith, Mr. Pappas, and Ms. Fagnani and a fourth non-party individual constitute

---

[1] Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions. *See generally* Dkt. Nos. 50, 53, 56.

[2] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

Defendant's senior management team.  Dkt. No. 53-30 at 24:25-25:18.  For at least the decade or so that Mr. Smith has served as President and CEO, no person of color has been part of Defendant's senior management team.  Dkt. No. 53-28 at 23:8-10, 24:11-13, 55:18-21, 57:9-13.  Defendant appears to have other employees of color, *id.* at 59:9-60:12, although Defendant's key managers are apparently white, *id.* at 55:18-57:13.

### B.  Relevant Events

Defendant hired Plaintiff on June 1, 2021 as a Senior Business Development Manager. Dkt. No. 53-1 at ¶ 4.

Around the time of his hire, Plaintiff signed documents acknowledging his receipt of Defendant's employee handbook and sexual harassment policy.  *Id.* at ¶ 8; *see also* Dkt. No. 50-8 at 157, 159.  Plaintiff contends that he only signed these documents at Ms. Fagnani's direction, and that he never actually received Defendant's employee handbook or sexual harassment policy, nor any policy relating to discrimination.  Dkt. No. 53-1 at ¶ 8.  Defendant's handbook contains a procedure for reporting complaints regarding harassment and discrimination.  *Id.* at ¶ 9.  The parties dispute whether Ms. Fagnani was responsible for investigating these complaints.  *Id.*

Plaintiff alleges that shortly after his hiring, Ms. Fagnani told him that he was hired because Defendant needed to "check a box" about hiring a Black employee to show that it had a diversified workforce.  Dkt. No. 1 at ¶ 15; Dkt. No. 53-27 at 33:10-34:14.  Another former employee of Defendant has testified that if not for Plaintiff and an Indian employee, "the company would be looked upon really poorly for only hiring White people" and that "[i]t was uncomfortable to hear the jokes about these two men who worked very, very hard and did a good job. . . . being joked about as being just token hires."  Dkt. No. 53-33 at 12:16-23.

Soon after Defendant hired Plaintiff, Defendant acquired Evonik Chemical Company

("Evonik") as a new client. Dkt. No. 53-1 at ¶ 11. During the onboarding process, Evonik required Defendant to complete a questionnaire which included the following section of questions:

### Equal Rights and Treatment of Employees

1. Is a member of your company's management responsible for ensuring equal rights and treatment of all employees, regardless of their ethnic origin, gender, age, handicap, religion, nationality, sexual orientation, social background, or political views?

2. Does your company have measures in place to ensure equal rights and treatment of all employees?

3. Can you confirm that your company does not violate the ILO Discrimination (Employment and Occupation) Convention (No. 111)?

4. Does your company provide employees an opportunity to give feedback and complaints to management?

*Id.* at ¶ 12. Mr. Smith asked Plaintiff to assist with onboarding Evonik, including responding to this questionnaire. *Id.* at ¶ 13. The parties dispute whether Mr. Smith directed Plaintiff to respond "yes" to each of the four questions above. *Id.* at ¶ 14.

After Plaintiff completed the questionnaire, he gave it to Ms. Fagnani to review for accuracy. *Id.* at ¶ 15. The parties dispute whether the "yes" responses to the four questions above are true and whether Plaintiff was asked to lie on the survey. *Id.* at ¶¶ 16-17. Evonik has remained a client of Defendant since being onboarded in mid-2021. *Id.* at ¶ 18.

In the fall of 2021, Don Mallot (a white employee of Defendant) had a conversation with Plaintiff during which Mr. Mallot used egregious racial slurs to refer to other employees, including "n****r," "sand n****r," and "towel head." *See, e.g.,* Dkt. No. 1 at ¶ 22. Plaintiff contends that when he reported this conduct to Ms. Fagnani, she "was not surprised that Don had been using those words" and she shared that Defendant had an ongoing investigation into Mr. Mallot in connection with his conduct with female coworkers. Dkt. No. 53-27 at 60:25-61:23. Ms. Fagnani

4

denies that Plaintiff, or any other employee, reported Mr. Mallot for using racial slurs. Dkt. No. 50-11 at 115:25-116:8. A report prepared by Ms. Fagnani and dated November 29, 2021 indicates that she conducted an investigation into other "allegations of inappropriate and unprofessional workplace conduct engaged in by Don Mallott . . . in accordance with the Company's policies, including its Anti-Discrimination/Anti-Harassment Policy." Dkt. No. 53-25 at 3. The report concluded that "[b]ased upon the investigation's findings, and Don's prior disciplinary history,[3] it is recommended that Don's employment be terminated." *Id.* at 4. Defendant ultimately terminated Mr. Mallot's employment. Dkt. No. 50-15 at 23 (citing, *inter alia*, Dkt. No. 50-8 at 61:24-62:9).

On another occasion during Plaintiff's employment with Defendant, Mr. Pappas and a number of Defendant's employees (including one named Elizabeth Polonski) were discussing the movie "Friday."[4] Dkt. No. 53-1 at ¶ 20. Defendant's COO proceeded to reenact one of his favorite scenes from the movie, and Defendant's other employees laughed. *Id.* at ¶ 21. Plaintiff saw everyone laughing and later asked Mr. Pappas what had been so funny. *Id.* Mr. Pappas again reenacted his favorite scene from the movie to show Plaintiff what everyone had been laughing about. *Id.* Plaintiff contends that Mr. Pappas imitated a Black character from the movie, did so in an offensive "black voice," and that Plaintiff reported the incident to Ms. Fagnani as a result. *Id.* at ¶¶ 22-23. The parties dispute Plaintiff's response to Mr. Pappas' reenactment. *Id.*

On a third occasion during Plaintiff's employment with Defendant, Ms. Polonski (who was

---

[3] Mr. Mallot had previously received a so-called "last chance" agreement. *See, e.g., id.* at 3; Dkt. No. 53-31 at 107:15-18.

[4] This film apparently stars, *inter alia*, Ice Cube, Chris Tucker, Nia Long, Tommy Lister Jr., Regina King, and Bernie Mac and follows "two unemployed friends who face troubles after becoming indebted to a drug dealer while also contending with the neighborhood bully in South Central Los Angeles." WIKIPEDIA, *Friday (1995 Film)*, https://en.wikipedia.org/wiki/Friday_(1995_film) (last visited July 17, 2026).

a direct report of Ms. Fagnani) approached Plaintiff regarding what a podcast host (Joe Rogan) had said. *Id.* at ¶ 24; Dkt. No. 50-11 at 117:10-118:4. The parties agree that Ms. Polonski asked Plaintiff about Joe Rogan's use of a racial slur during the podcast. Dkt. No. 53-1 at ¶ 24. Defendant contends that Ms. Polonski also shared that she found use of the "N-word"[5] offensive, and was surprised that Joe Rogan had said it. *Id.* Plaintiff contends that Ms. Polonski used the full epithet, not an abbreviation, and said that Joe Rogan should "get a pass." *Id.* The parties agree that Plaintiff did not report this incident to Ms. Fagnani. *Id.* at ¶ 25.

In his sales role with Defendant, Plaintiff earned a base salary of $100,000 and had a $4 million sales quota for 2022. *Id.* at ¶¶ 5, 26. That same year, Defendant's only other salesperson had a base salary of $80,000 and a sales quota of $3.8 million. *Id.* at ¶ 27. The parties dispute whether Plaintiff performed well during his employment with Defendant. *See, e.g., id.* at ¶¶ 30, 36. The parties also dispute whether Plaintiff had the opportunity to regularly meet with Mr. Smith and Mr. Pappas. *Id.* at ¶¶ 30-31.

On March 24, 2022, Mr. Smith and Mr. Pappas met with Plaintiff. *Id.* at ¶ 33. The parties agree that Mr. Smith and Mr. Pappas did not have any discussion about or intent to terminate Plaintiff prior to this meeting. *Id.* at ¶ 34. During the meeting, the participants discussed Plaintiff's sales activity and Defendant's CEO and COO asked Plaintiff if he actually wanted to work at Defendant. *Id.* at ¶¶ 35-37. Defendant contends that "Mr. Smith and Mr. Pappas perceived Plaintiff's response as being defensive and agitated." *Id.* at ¶ 38. Plaintiff contends that he expressed shock over this line of questioning, explained that his performance was not being

---

[5] This "epithet has been described as a term that sums up . . . all the bitter years of insult and struggle in America, a pure anathema to African-Americans, and probably the most offensive word in English." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) (first alteration in original) (quotations and citation omitted).

accurately measured or evaluated, and stated that he felt he was being subjected to disparate treatment based on his race. *Id.*

According to the parties, Plaintiff felt that Mr. Smith was trying to get him to resign and "[i]t was only after Mr. Smith tried to get Plaintiff to resign that Plaintiff mentioned that he felt he was being 'treated differently' at [Defendant] because of his race." *Id.* at ¶¶ 39-40. Plaintiff also stated that he had been excluded from, *inter alia*, management meetings, bonuses, and boat trips.[6] *Id.* at ¶ 41. Plaintiff has testified that he provided numerous other examples of disparate treatment during this meeting, including a lack of performance reviews, lack of access to leadership, lack of commission payments, heightened performance standards, heightened attendance standards, denial of relevant training, and exclusion from meetings with customers assigned to him. Dkt. No. 53-27 at 90:9-91:12; *id.* at 94:10-99:19.

Plaintiff contends that immediately after he complained about being treated differently on account of his race, Mr. Smith stated "Milton, this isn't working out for either of us, it's time we part ways." *Id.* at ¶ 43. Defendant responds that Mr. Smith instead made this statement "because of Plaintiff's conduct during the meeting and his lack of engagement[.]" *Id.*

Plaintiff asserts that he was shocked by Mr. Smith's statement, and asked for clarification. *Id.* at ¶¶ 44-45. Defendant asserts that Plaintiff raised his voice and "ultimately forced Mr. Smith to say he was fired." *Id.*

Subsequently, Plaintiff left the room, eventually found Ms. Fagnani, and begged her to come back to meeting room. *Id.* at ¶¶ 46, 48. Once Ms. Fagnani arrived, Plaintiff asked Mr. Smith to repeat the statement, and Mr. Smith repeated that Plaintiff was terminated. *Id.* at ¶ 49.

---

[6] The parties agree that Mr. Smith owns a boat, but dispute whether gatherings of employees on that boat were formal or informal. *Id.* at ¶ 42.

According to Defendant, Plaintiff was "very angry" at this time; according to Plaintiff, he was "shocked" and "very stressed" but not angry. *Id.*

Following Plaintiff's termination, he filed a charge with the Equal Employment Opportunity Commission ("EEOC") on December 16, 2022, alleging that Defendant discriminated against him because of his race and retaliated against him. *Id.* at ¶ 51. On or about September 19, 2024, the EEOC issued Plaintiff a right to sue notice. *Id.* at ¶ 52. This litigation commenced days later. Dkt. No. 1.

### C. Plaintiff's Claims

Plaintiff asserts discrimination and retaliation claims under Section 1981, Title VII, and the NYSHRL. *Id.* at ¶¶ 41-121. Plaintiff seeks, *inter alia*, damages as well as injunctive and declaratory relief. *Id.* at 18-19.

## III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

A defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

### A. Discriminatory Termination Claims

According to Plaintiff, he "alleges that Defendant terminated his employment based on his race, in violation of Title VII, Section 1981, and the NYSHRL." Dkt. No. 53 at 24. "To succeed on this theory under § 1981, Title VII, and the New York State Human Rights Law, [a plaintiff] must satisfy the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 . . . (1973)." *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 47 (2d Cir. 2025) (citations omitted).

Under the three-step *McDonnell-Douglas* framework, a plaintiff "must first show that (1) she belonged to a protected class, (2) she was qualified for her job, (3) she was fired, and (4) her

9

firing took place 'under circumstances giving rise to an inference of discriminatory intent.'" *Id.* (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)). "The burden at this stage 'is not onerous.'" *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (quoting *Banks*, 81 F.4th at 270). If a plaintiff "meets this prima facie burden, 'a presumption of discriminatory intent arises,' and the burden shifts to [the employer] 'to articulate a legitimate, non-discriminatory reason for' firing her." *Knox*, 134 F.4th at 48 (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019)). If the employer carries its burden, "then the burden shifts back to [the plaintiff], who must show that [the employer]'s justification was pretextual *or* that her firing 'was motivated at least in part by [her] membership in a protected class.'" *Id.* (fourth alteration in original) (emphasis added) (first quoting *Bart*, 96 F.4th at 576; and then citing *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 121 (App. Div. 2011)). Finally, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Borzon v. Green*, 778 F. App'x 16, 18 (2d Cir. 2019) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

At step one, Defendant exclusively challenges the final element of Plaintiff's prima facie case, arguing that "the circumstances in this case fail to raise an inference of race discrimination[.]" Dkt. No. 50-15 at 15. In support of this position, Defendant focuses on alleged events around the date of Plaintiff's initial hiring on June 1, 2021, namely, Ms. Fagnani's "check the box" comment, whether Defendant was hired because he was Black and in order to acquire certain new business, and whether Mr. Smith directed Plaintiff to lie on the Evonik onboarding documentation with respect to equal rights and treatment at Defendant. *Id.* at 15-19; *see also* Dkt. No. 56 at 5-7. Drawing all inferences in favor of the non-moving party, the Court agrees with Plaintiff that this

10

evidence could support an inference of discrimination based on race. *See, e.g.,* Dkt. No. 53 at 25-29.

Even if the Court were to agree with Defendant that this evidence regarding alleged events in or about June 2021 is insufficient, Defendant fails to address evidence in the record regarding alleged events during the ensuing nine or so months leading up to Plaintiff's termination on March 24, 2022. As detailed above, such evidence includes both Defendant's COO and Ms. Fagnani purportedly making comments to Plaintiff that could be reasonably interpreted as discriminatory, as well as Plaintiff complaining about instances of alleged discrimination he experienced. *See supra* Section II.B. And because both Defendant's COO and CEO participated in the meeting during which Plaintiff's employment was terminated, the Court is not persuaded that Mr. Pappas' alleged comments should be deemed stray remarks, given the current record. *See, e.g., Banks*, 81 F.4th at 266 ("While it is true that the stray remarks of a decisionmaker, without more, cannot prove a claim of employment discrimination, we have held that when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance.'") (citations omitted); *see also Lenzi*, 944 F.3d at 112 ("[W]e consider four factors when assessing the probative value of such remarks: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).") (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).[7]

---

[7] Indeed, Defendant only argues that Ms. Fagnani's remarks, and not Mr. Pappas' remarks, are stray remarks. *See generally* Dkt. No. 50-15 at 17; Dkt. No. 56 at 6-7.

11

Additionally, the parties agree that Mr. Smith and Mr. Pappas entered the March 24, 2022 meeting without having discussed terminating Plaintiff or intending to terminate Plaintiff, and a reasonable jury could conclude that Plaintiff's employment was terminated during that meeting only after Plaintiff raised numerous instances of alleged disparate treatment based on his race. *See supra* Section II.B. Because the evidence in the current record permits a reasonable inference that Plaintiff's termination was discriminatory, the Court finds that Plaintiff has carried his burden at step one.

At step two, Defendant argues that it has articulated legitimate non-discriminatory reasons for terminating Plaintiff's employment, and appears to cast the decision to do so as "performance-based" and/or based on Plaintiff's "insubordinate conduct" during the meeting. Dkt. No. 50-15 at 19-20. Given the current record, the Court agrees with Plaintiff that Defendant has failed to carry its burden at step two. Dkt. No. 53 at 29. First, the factual record is disputed as to how Plaintiff performed. *See supra* Section II.B. Contemporaneous documentation regarding Plaintiff's purportedly poor performance appears absent from Defendant's motion. *See generally* Dkt. Nos. 50-1, 50-15. Second, even if Plaintiff was performing poorly in his sales role, the parties agree that neither Mr. Smith nor Mr. Pappas had discussed terminating Plaintiff or intended to terminate him at the start of the March 24, 2022 meeting—for any reason, including Plaintiff's purportedly poor performance. Dkt. No. 53-1 at ¶ 34. Simply put, Defendant cannot, on this sparse record, articulate that Plaintiff was terminated because he was performing poorly. *Compare Fu v. Consol. Edison Co. of N.Y., Inc.*, 855 F. App'x 787, 790 (2d Cir. 2021) ("[A]t the second step, [defendant] met its burden of articulating a nondiscriminatory reason for [plaintiff]'s termination: her unsatisfactory work performance. *To satisfy its burden at this step, a defendant must articulate its nondiscriminatory reason 'through the introduction of admissible evidence' and that reason must*

be 'clear and specific.' [Defendant] proffered ample admissible evidence that [plaintiff] was terminated for her unsatisfactory work performance. She received a negative final performance review in March 2014, a full year before the March 2015 remarks on which she relies to establish her prima facie case. [Defendant]'s documented dissatisfaction with her work performance, in two detailed performance reviews for the 2013 and 2014 calendar years, is sufficient to discharge it of its 'burden of production under the second prong,' and shift the burden back to [plaintiff] to demonstrate that this proffered reason was a pretext for [ ] discrimination.") (emphasis added) (citations omitted).

Defendant's second reason is similarly unsupported. Defendant argues that Plaintiff's response to Mr. Smith and Mr. Pappas during the meeting justified his termination on the spot. *See* Dkt. No. 50-1 at ¶ 38 (Defendant's statement of material facts asserting that, during the meeting, "Mr. Smith and Mr. Pappas perceived Plaintiff's response as being defensive and agitated"); *id.* at ¶ 43 (same, asserting that "because of Plaintiff's conduct during the meeting and his lack of engagement, Mr. Smith said, 'Milton, this isn't working out for either of us, it's time we part ways'"). The Court agrees with Plaintiff that the current record is also insufficient for Defendant to articulate this as the legitimate, non-discriminatory reason for Plaintiff's termination. Dkt. No. 53 at 29.

At this stage, even if Defendant had carried its burden with respect to step two, Plaintiff would still prevail at step three. The Court agrees with Plaintiff, at least on the current record, that he has carried his burden by showing that Defendant's stated reason(s) are pretextual, particularly given the shifting nature of Defendant's explanations. Dkt. No. 53 at 29. Moreover, drawing all reasonable inferences in favor of Plaintiff as the non-moving party, the evidence of Plaintiff's prima facie case is sufficient to also carry Plaintiff's burden at step three. *See Bart*, 96 F.4th at

13

576 ("[W]e have recognized that '[t]hough the plaintiff's ultimate burden may be carried by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, it may often be carried by reliance on the evidence comprising the prima facie case, without more,' if that evidence is independently sufficient under step three of *McDonnell Douglas*.") (second alteration in original) (citation omitted). Because a reasonable jury could find that Plaintiff was terminated, at least in part, because of his race, summary judgment against Plaintiff on his discriminatory termination claims is not appropriate. *Knox*, 134 F.4th at 48. As a result, the Court denies this portion of the Motion.[8]

### B. Retaliatory Termination Claims

Title VII prohibits, *inter alia*, an employer from retaliating against an employee because the employee has engaged in protected activity. *See, e.g., Ya-Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). "Protected activity includes opposing an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating 'in any manner in an investigation, proceeding, or hearing.'" *Banks*, 81 F.4th at 275 (citations omitted). As relevant in this particular case, "[r]etaliation claims brought under the NYSHRL and § 1981 are subject to the same standards as federal claims under Title VII[,]" *id.* (citations omitted), "including the *McDonnell Douglas* burden-shifting framework described earlier," *Knox*, 134 F.4th at 49 (citations omitted). "A prima facie case of retaliation is established by showing: '(1) [the employee] engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" *Fu*, 855 F. App'x at 791 (alteration in original) (quoting *Summa v. Hofstra*

---

[8] The Court finds that applying the so-called "same actor inference" is not appropriate on the current record, *see generally Hagan v. City of New York*, 39 F. Supp. 3d 481, 498 (S.D.N.Y. 2014), largely for the reasons stated by Plaintiff, Dkt. No. 53 at 29-30; *see also* Dkt. No. 53-10 at 4-5.

*Univ.*, 708 F.3d 115, 125 (2d Cir. 2013)).  If an employer "can then 'articulate some legitimate, non-retaliatory reason for' firing her, [plaintiff] must then prove that her protected activity 'was a 'but-for' cause of' her firing, which she can do by showing that [the employer]'s proffered reason is pretextual."  *Knox*, 134 F.4th at 49 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-46 (2d Cir. 2013)).

Because the burden-shifting analysis for Plaintiff's retaliatory termination claims largely tracks the analysis for Plaintiff's discriminatory termination claims detailed above, the Court will not rehash it in detail.  *See generally supra* Section IV.A.

Simply put, construing the facts, "as they must be, with all reasonable inferences drawn in [Plaintiff]'s favor," *Banks*, 81 F.4th at 251 (citations omitted), a reasonable jury could find that Defendant terminated Plaintiff in retaliation for Plaintiff complaining of numerous instances of disparate treatment, *see supra* Section II.B.  Indeed, Plaintiff entered a meeting with Defendant's CEO and COO (prior to which neither had discussed terminating him or intended to terminate him), contends that he complained about a laundry list of discriminatory treatment, and was terminated in that very same meeting almost immediately.  Moreover, during this litigation, Defendant appears to have offered shifting explanations for why Plaintiff was terminated.  *See, e.g.,* Dkt. No. 53 at 14-18, 29; *Zann Kwan*, 737 F.3d at 847 ("[Plaintiff]'s evidence of [defendant]'s inconsistent explanations for her termination and the very close temporal proximity between her protected conduct and her termination are sufficient to create a triable issue of fact with regard to whether the September 3 complaint was a but-for cause of her termination.").

The primary deficiencies with Defendant's arguments to the contrary are that these arguments rely on disputed facts and construe the factual record in favor of the moving party, neither of which is permissible at this stage.  *See, e.g.,* Dkt. No. 50-15 at 32-35; Dkt. No. 56 at 12-

15

14. Additionally, and as Plaintiff again correctly notes, Defendant does not address the vast majority of the alleged disparate treatment about which Plaintiff has testified that he complained during the meeting on March 24, 2022. Dkt. No. 53 at 13; *see also supra* Section II.B. To be clear, a jury may ultimately determine that the March 24, 2022 meeting unfolded as Defendant argues, and also proceed to draw various inferences about that meeting against Plaintiff. But those determinations are solely for the jury and should occur once the jury has had the opportunity to examine evidence, hear competing testimony, and assess the credibility of witnesses. The present record before the Court does not permit judgment as a matter of law in Defendant's favor. *Galeotti*, 2013 WL 3207312, at *4 ("When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'") (citation omitted). As a result, the Court denies this portion of the Motion.

## C. Hostile Work Environment Claim

"To establish a hostile work environment claim under [federal or New York law], a plaintiff must first produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Knox*, 134 F.4th at 50-51 (alteration in original) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023)). "Hostile work environment claims brought under Title VII, § 1981, and the NYSHRL are assessed using the same standard." *Banks*, 81 F.4th at 261-62 (collecting cases).[9] Courts "employ a totality of the circumstances approach to evaluate whether

---

[9] "But the NYSHRL was amended in 2019 to 'be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed.' 'While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL,' some courts in this Circuit 'have interpreted the amendment as rendering the standard for claims closer to the [more forgiving] standard of the NYCHRL [New York City Human Rights Law].'" *Cooper v. Franklin Templeton Invs.*, No. 22-

16

an environment is hostile and abusive, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citation omitted). "Under this standard, racially offensive comments by a coworker can create a hostile work environment, as can offensive comments based on a person's ancestry or national origin." *Knox*, 134 F.4th at 51 (citation omitted). "Under federal and state law, '[t]o withstand summary judgment, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* (alteration in original) (citation omitted).

The Court agrees with Plaintiff that the Motion's challenge to the severity and pervasiveness of his allegations are unpersuasive and "improperly breaks down Plaintiff's hostile work environment claim into separate incidents and evaluates them in isolation." Dkt. No. 53 at 19; *see also* Dkt. No. 50-15 at 23-28. The totality of the circumstances here is much more than a series of isolated incidents, and is sufficient to create a genuine factual dispute under this standard. *Banks*, 81 F.4th at 262 ("The hostility of the work environment 'as a whole, not the motivation of one decisionmaker,' is the central inquiry in a hostile work environment claim, and 'liability is determined only by looking at all the circumstances.' 'Evidence of a general work atmosphere . . . -- as well as evidence of specific hostility directed toward the plaintiff -- is an important factor in evaluating the claim.'") (alteration in original) (first quoting *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d

---

2763-cv, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (summary order) (citations omitted); *see also Ferrando-Dehtiar v. Anesthesia Grp. of Albany, P.C.*, 727 F. Supp. 3d 165, 189 (N.D.N.Y. 2024). Because any difference in standards is not implicated on the current record for the reasons discussed below, the Court "need not resolve the impact of these amendments here[.]" *Cooper*, 2023 WL 3882977, at *3.

379, 389 (2d Cir. 2020); and then quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

As detailed above, *see supra* Section II.B, there is evidence that Plaintiff never received Defendant's discrimination policy when he was hired, and Ms. Fagnani, the person purportedly responsible for investigating violations of that policy, suggested that Plaintiff was a diversity hire. Some of Plaintiff's coworkers allegedly referred to him as such. In addition, there is evidence that Defendant employs few people of color, and seemingly none on the management team. Despite this, Plaintiff was allegedly instructed to lie about Defendant's conduct and policies regarding equal rights and treatment in order to help acquire a new client. Plaintiff was subsequently subjected to the use of racial epithets by two individuals, one of whom was a direct report of Ms. Fagnani. *Rasmy*, 952 F.3d at 383 ("We hold that . . . (2) discriminatory conduct not directly targeted at the plaintiff (*e.g.*, discriminatory remarks made in the plaintiff's presence though not directly aimed at such employee) can contribute to an actionable hostile work environment[.]"). A reasonable jury could conclude that, after Defendant's white COO purportedly reenacted impressions of a Black movie character in an offensive voice and Plaintiff reported the conduct to Ms. Fagnani, Defendant took no action in response and Defendant's COO subsequently participated in the termination of Plaintiff's employment. Additionally, prior to that time, Plaintiff contends that he was treated differently because of his race and had been excluded from management meetings, bonuses, commission payments, boat trips, performance reviews, meetings with customers assigned to him; that he had heightened performance and attendance standards imposed on him; and that he was denied access to leadership and training.

In short, a reasonable jury could conclude that Plaintiff faced a hostile work environment. *Banks*, 81 F.4th at 262 ("If a rational juror could infer that a reasonable employee would have

viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of a lack of an adverse employment decision is inappropriate.") (citation omitted).  Because summary judgment is not appropriate, the Court denies this portion of the Motion.[10]

## V.  CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, Dkt. No. 50, is **DENIED**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 21, 2026
Albany, New York

Anne M. Nardacci
U.S. District Judge

---

[10] On the current record, Defendant has not established the so-called *Faragher/Ellerth* defense. Dkt. No. 50-15 at 28-29.  This defense requires an employer to show, *inter alia*, that it "exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior[.]" *Douyon v. N.Y.C. Dep't of Educ.*, 665 F. App'x 54, 58 (2d Cir. 2016) (first alteration in original) (discussing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).  Defendant argues that this defense is warranted because Mr. Mallot's termination occurred after Plaintiff reported his use of racial epithets to Ms. Fagnani. However, that simple temporal sequence does not establish that Defendant exercised reasonable care to prevent and promptly correct the issue.  In fact, Ms. Fagnani disputes that Plaintiff reported Mr. Mallot's use of racial epithets and the current record does not indicate that Defendant conducted any investigation into the race-based conduct Plaintiff asserts that he reported, as opposed to the sex-based conduct female employees and others separately reported.  *See supra* Section II.B.  And the contemporaneous investigative report does not even mention the conduct about which Plaintiff contends that he complained.  *Id.*  Finally, even if Defendant had established this defense with respect to Mr. Mallot's alleged conduct, that does not address the other alleged instances of hostility on which this claim relies.